IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 4, 2016 Session

**STATE OF TENNESSEE v. EDYTHE CHRISTIE**

**Appeal from the Circuit Court for Madison County**
**No. 14-461    Donald H. Allen, Judge**
_____

**No. W2015-02485-CCA-R3-CD  -  Filed December 30, 2016**
_____

Defendant, Edythe Christie, appeals her conviction of tampering with evidence. The trial court denied judicial diversion, sentencing Defendant to four years and six months, with all but 150 days of the sentence to be served on probation. On appeal, Defendant challenges the sufficiency of the evidence, the jury instruction on tampering with the evidence, and the denial of judicial diversion. Defendant also argues that juror bias violated her right to a fair trial and impartial jury. After a review of the issues, we determine that Defendant is not entitled to relief. Consequently, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Harold E. Dorsey, Alamo, Tennessee, for the appellant, Edythe Christie.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Jerry Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant, a lawyer, was indicted by the Madison County Grand Jury in September of 2014 for tampering with evidence. The case against Defendant arose in conjunction with the investigation into the death of Brittany Christie, who was found dead in a motel room in Jackson, Tennessee, in early December of 2013 from an apparent

overdose of heroin and Klonopin. John Christie, Defendant's son, was the estranged husband of the victim.

During the investigation into the death of the victim, the police interviewed Mr. Christie, and learned that he was with the victim at a hotel on December 5-6, 2013. Mr. Christie provided the victim with heroin. Shortly after she ingested the heroin, the victim got sick and passed out. Mr. Christie left the hotel because he was afraid to be caught there because he had outstanding arrest warrants against him. He called 911 from his cell phone. Mr. Christie was arrested on the outstanding warrants on December 6, 2013. He gave a statement to police about the victim's death. In April, after autopsy results confirmed that the victim died from "too many drugs, too soon," Mr. Christie was eventually indicted for second degree murder.

Mr. Christie was held in jail on the outstanding warrants. While in jail, he called Defendant nearly every day. The telephone calls were recorded[1] and eventually monitored and listened to by Investigator Daniel Long beginning some time in January of 2014.

On or around December 19, 2013, Mr. Christie called Defendant and told her that the police took his cell phone from his person when he was arrested. Mr. Christie wanted Defendant to come to "the property" at the jail and get his cell phone. Defendant expressed concern over what Mr. Christie was asking her to do, saying "something about [him] getting her mixed up in a mess," but indicated a willingness to do what Mr. Christie instructed. Mr. Christie asked Defendant to "delete everything" from the phone and destroy the "SD"[2] card. Defendant told Mr. Christie, "Ok, I will," but informed him that anyone could retrieve the data from the phone even if it was erased. Mr. Christie told Defendant it was a pre-paid phone so there would "be no record." Defendant told Mr. Christie she would get the phone the next day because visiting hours were already over for the day. On December 20, 2013, Defendant came to the jail and took possession of Mr. Christie's cell phone. At the time, police had not designated the phone as evidence.

During a call from Mr. Christie to Defendant on December 20, Defendant again cautioned Mr. Christie that the police monitored and recorded the phone calls placed from the jail. Mr. Christie became angry with Defendant and expressed frustration over the fact that she had not yet hired an attorney or contacted any of Mr. Christie's friends to help with his defense. Defendant explained to Mr. Christie that he had not been charged with anything. Mr. Christie urged Defendant to delete items from his phone.

---

[1] The jail contracted with a company called Securus. Their program records calls by assigning a PIN number to each inmate that must be entered prior to initiating a telephone call from the jail.

[2] The "SD" card is a small removable flash memory card designed to provide high-capacity memory in a cell phone.

The same day, Mr. Christie called his mother a second time. Defendant again told Mr. Christie that all of the jail house phone calls were recorded. Defendant told Mr. Christie that she "got what [he] released to [her]." Mr. Christie asked if Defendant "freed up any space," and Defendant told Mr. Christie that the battery to the phone was dead when she picked it up from the jail. The next day, Mr. Christie called Defendant to ask if she had done "it," and Defendant responded that she had deleted the content on the phone.

An attorney was appointed to represent Mr. Christie on the probation violation charge. Defendant eventually retained the same attorney to represent Mr. Christie with regard to charges he might face in connection with the victim's death. At the time, he had not been charged in connection with the victim's death. In early May, Defendant gave Mr. Christie's cell phone to the attorney. Defendant mentioned that there could be "some exculpatory material on there that would benefit [Mr. Christie's] case." The attorney tried "once or twice" to access the phone, eventually deciding she would "worry about that later." The attorney recalled that the evidence pertained to Facebook messages that might indicate the victim contacted Mr. Christie to obtain the drugs which eventually led to her death. Once the warrant was served, the attorney withdrew from representation of Mr. Christie due to a potential conflict of interest.

About ten days after Defendant gave the phone to the attorney, law enforcement officers issued a search warrant for the attorney's office, specifically looking for a notebook and the cell phone. The attorney turned over the phone and informed officers that she did not access the phone while it was in her possession. The attorney later testified at trial that Defendant informed the attorney in an email that she "[d]eleted some photos and video" from the phone "when she first got it" from the jail "but she did not consider it to be relevant to the investigation at that time." Defendant deleted "pictures of and video of [Mr. Christie and the victim] having intercourse in what looked like a motel bathroom." Defendant wrote in the email that she "had no idea that the phone would ever be evidence."

Officer Jay Stanfill processed the cell phone using Photorec recovery software, a computer program designed to recover deleted files, and discovered five photographs and a video that had been deleted from the phone. The photographs depicted the victim in what appeared to be a hotel bathroom while the video recording depicted Mr. Christie and the victim having intercourse in the same location. The original time and date stamp placed Mr. Christie in the hotel room with the victim on the day of her death. Officer Stanfill explained at trial that photographs and video are usually stored on an SD memory card inside a cell phone. Items that are deleted from the phone by hitting the "delete" button can usually be recovered from the SD card using recovery software.

Mr. Christie testified at trial. He admitted that he asked Defendant to "clear everything" off his phone because he was under investigation. Mr. Christie admitted that the deleted video was "sexual in nature" and claimed it was taken on December 5, the day before the victim died. Mr. Christie claimed that he actually did not intend for Defendant to erase the video and photographs of the victim. Instead, he wanted Defendant to erase anything on the phone dealing with drug usage. He thought that he asked Defendant to "get rid of the SD card." Mr. Christie testified that he was under the impression that Defendant knew what he was asking her to do and that she never gave any indication that she was unwilling to help him.

Lieutenant Phillip Gibson of the Union City Police Department testified for Defendant at trial. He recalled that she attended three days of a training seminar for the West Tennessee Criminal Investigator's Association. One of the classes at the seminar was about internet crimes against children. Investigator Terry Buckley of the Jackson Police Department taught the class, part of which was about deleting and recovering items from cell phones. Investigator Buckley taught that deleted data is "recoverable in most instances" by using software that "makes an exact copy of the device's memory." The software can identify if the information has been deleted.

Defendant testified that, at the time of trial, she had been practicing law for nineteen years. She recalled that her son was "harassing" her daily from jail about getting a lawyer and retrieving his phone from property because he was scared that he might be charged with a crime in connection with the death of the victim. Defendant told her son that she would go get the phone "mainly just to get him to stop harassing [her] about it." At the time she retrieved the phone from the jail, the autopsy results were not complete, and Mr. Christie had not been charged with anything other than probation violations. Defendant claimed that she "never had any intention of doing anything to that cellphone" but eventually charged the phone and "just looked at it." Defendant went on to explain that in January or February she looked through the photographs on the phone. When she saw photographs of the victim, she had a "gut reaction" and "just deleted them." Defendant testified that the pictures "broke [her] heart" because the victim and Mr. Christie had been separated for a long time and she thought that they had "moved on." Defendant did not think it would be good for Mr. Christie to "look at those pictures" or "watch that video." At the time she deleted the photos, she did not think about whether the items she deleted were "evidence." She claimed she deleted them "to protect [Mr. Christie] and his children and [the] mother of his children."

Defendant did not think that the phone was relevant evidence because the case "hinged on the autopsy report" and Mr. Christie's statement to police that he was with the victim before she died. Defendant also knew from a training class she attended that the pictures could be recovered by the police. She explained that if she wanted to permanently delete the photographs and video, she would have destroyed the SD card and

- 4 -

"gotten rid of the phone." Defendant admitted that she held on to the phone until after Mr. Christie was indicted for the victim's death but that she eventually gave it to Mr. Christie's attorney. Defendant testified that she "[a]bsolutely" did not delete the photographs with the intent to impair their verity, legibility, or availability as evidence in an investigation or official proceeding. However, Defendant admitted that she knew what Mr. Christie was asking her to do was to commit a crime. Additionally, Defendant testified that, as an attorney, she never instructed clients to delete items off their phones.

At the conclusion of the trial, the jury found Defendant guilty of tampering with the evidence. Prior to sentencing, Defendant introduced an application for judicial diversion. The trial court held a rather lengthy sentencing hearing at which several witnesses testified. The trial court considered the factors in favor of and against the grant of judicial diversion, ultimately concluding that Defendant was not an appropriate candidate for judicial diversion. The trial court sentenced Defendant to a sentence of four years and six months. The trial court determined that a sentence of full probation would depreciate the seriousness of the offense, ordering Defendant to serve a "period of shock incarceration of a hundred and fifty days" prior to release on probation.

Defendant filed a timely motion for new trial. It was later amended by counsel. The trial court denied the motion after a hearing. A timely notice of appeal followed the denial of the motion for new trial. On appeal, Defendant raises the following issues: (1) whether the evidence was sufficient to support the conviction for tampering with the evidence; (2) whether the trial court properly instructed the jury on the elements of tampering with the evidence; (3) whether Michael Robinson's presence on the jury violated Defendant's right to a fair and impartial jury; and (4) whether the trial court abused its discretion in denying judicial diversion.

*Sufficiency of the Evidence*

Defendant insists on appeal that the evidence was not sufficient to support her conviction for tampering with the evidence. Specifically, she argues that the video and photographs on the cellphone were not evidence and that she did not delete the items "with the intent to destroy or conceal the photographs or video" and the State did not prove "any of the three elements" of timing, action, or intent. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d

247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *Wagner*, 382 S.W.3d at 297 (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id*. The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Tennessee Code Annotated section 39-16-503(a)(1) sets forth the following definition of tampering with evidence:

> (a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress to:
>
> (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]

T.C.A. § 39-16-503(a)(1).

This statute requires the State to prove "timing, action, and intent" beyond a reasonable doubt. *State v. Hawkins*, 406 S.W.3d 121, 132 (Tenn. 2013) (quoting *State v. Gonzales*, 2 P.3d 954, 957 (Utah Ct. App. 2000)). "The 'timing' element requires that the act be done only after the defendant forms a belief that an investigation or proceeding 'is *pending or in progress*.'" *Id*. (emphasis added); *see also State v. Smith*, 436 S.W.3d 751, 763 (Tenn. 2014). The Tennessee Supreme Court recently considered the "timing" element and clarified that the word "pending" in Tennessee Code Annotated section 39-16-503(a) is synonymous with "impending." *Smith*, 436 S.W.3d at 763 (quoting *Lumpkin v. State*, 129 S.W.3d 659, 663 (Tex. App. 2004) (determining that "pending" means "impending or about to take place")). In *Smith*, the defendant abandoned his wife's car in a parking lot with plans to report her missing, intending to steer police to the vehicle in order to confuse the investigation. 436 S.W.3d at 765. The court concluded that evidence that the defendant moved his wife's car prior to reporting her missing was sufficient to sustain his conviction under the statute. *Id*. Additionally, this Court has

upheld convictions in other cases where the defendant had reason to know that an investigation was impending but the investigation was not yet in progress. *See State v. Travontay Tremont Berry*, No. W2014-00808-CCA-R3-CD, 2015 WL 1951885, at \*3 (Tenn. Crim. App. Apr. 30, 2015) (upholding conviction where the defendant fired a gun in the air, which started fight resulting in the death of two people, then got rid of his gun prior to his arrest), *no perm. app. filed*; *State v. Eric Ricardo Middleton*, No. W2010-01427-CCA-R3-CD, 2011 WL 5573730, at \*22 (Tenn. Crim. App. Nov. 14, 2011) (upholding conviction where the defendant orchestrated cleaning up blood and concealing the victims' bodies long before authorities were alerted to the crimes), *perm. app. denied* (Tenn. Apr. 12, 2012); *State v. Samuel Alan Ireson*, No. E2010-01648-CCA-R3-CD, 2011 WL 2410322, \*6 (Tenn. Crim. App. June 10, 2011) (upholding conviction where the evidence supported the conclusion that the defendant planted a knife on the victim contemporaneously with the crime and around the time of the 911 call), *perm. app. denied* (Tenn. Sept. 21, 2011).

"The 'action' element requires alteration, destruction, or concealment." *Hawkins*, 406 S.W.3d at 132. The court explained that to "alter" is "to make different without changing into something else" and to "destroy" means to ruin its "evidentiary value." *Id.* (citing *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010)).

For "intent" to be established, the proof must show that through his or her actions, the defendant intended "to hinder the investigation or official proceeding by impairing the record's, document's or thing's 'verity, legibility, or availability as evidence.'" *Id.* (quoting T.C.A. § 39-16-503(a)(1)). Tampering with evidence is a "specific intent" crime. *Id.* (internal citations omitted).

Defendant cites one case, *Hawkins*, to support her argument that the State did not prove the three elements because she did not believe an official investigation was pending at the time she got the phone, she did not intend to destroy evidence, and the items on the phone were not evidence. Viewing the evidence in a light most favorable to the State, we note that Defendant testified at trial that she was aware that the police were investigating Mr. Christie in regard to the victim's death. Additionally, Defendant admitted that she deleted the photographs and the video depicting the victim and Mr. Christie in the hotel room where the victim was ultimately found dead. Defendant's admissions alone established the elements of timing and action. The main issue for the jury was Defendant's intent. Defendant testified that she knew the items could be recovered from the phone by law enforcement personnel and that by deleting the items from the phone, she did not intend to "impair [the evidence's] verity, legibility, or availability as evidence in the investigation or official proceeding." The State's theory was that Defendant acted with the intent to destroy or conceal the photographs and video. The ultimate discovery of the photographs and videotape on the phone by the police after the use of recovery software is of no consequence to Defendant's intent. It is up to the

jury to determine questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof.'" *Wagner*, 382 S.W.3d at 297 (quoting *Campbell*, 245 S.W.3d at 335). The jury heard the proof and determined that Defendant acted with the intent necessary to sustain the conviction. It is not our role to reweigh or reevaluate the evidence nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277 (quoting *Bland*, 958 S.W.2d at 659). The evidence was sufficient to support the conviction for tampering with the evidence.

*Jury Instructions*

Defendant next complains that the trial court improperly instructed the jury on tampering with the evidence. Specifically, Defendant claims that the State only had to prove two elements in order for Defendant to be found guilty of tampering with the evidence. The only support for this claim in Defendant's brief is the following statement, "*State vs. Hawkins* clearly states that there are three elements in the statute and the Court refers to them as timing, action, and intent elements." The State, on the other hand, submits that the trial court did not err because the trial court utilized the pattern jury instruction.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

We find Defendant's brief with regard to this issue to be inadequate. Consequently, this issue is suitable for waiver pursuant to Rule 10(b) of the Rules of the Court of Criminal Appeals. ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Waiver notwithstanding, we note that there was some discussion about jury instructions during voir dire. Counsel for Defendant was explaining to the jury pool that the State was going to have to prove that Defendant tampered with evidence, "a crime that has basically three elements." The State objected, noting that the pattern jury instruction only contained "two elements." The trial court agreed, commenting that the State had to prove (1) "defendant knew an investigation was pending or was in progress,

and (2) that the defendant altered, destroyed, [or] concealed [the evidence] with the intent to impair its availability as evidence in the investigation." The trial court told the jury to "disregard" what was said about the State "having to prove three elements" because an instruction would be given at the conclusion of the proof. At the conclusion of the proof, there was minimal discussion regarding jury instructions and no mention of the number of elements in the crime before the trial court gave the following jury instruction on the offense:

## Tampering with Evidence

Any person who tampers with evidence is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant knew an investigation was pending or in progress; and

(2) that the defendant altered or destroyed or concealed a record or document with the intent to impair its availability as evidence in the investigation.

"Conceal" means to prevent disclosure or recognition of or to place out of sight a record or a document or thing.

"Destroy" means to ruin the evidentiary value of a record or document or thing.

"Thing" means an object or entity not precisely designated or capable of being designated.

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

After the court has instructed the jury, the parties may lodge an objection to instructions which were given or to the failure to give requested instructions. Counsel for Defendant did not object to the instruction after it was given. However, "[c]ounsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial." Tenn. R. Crim. P. 30(b). When a defendant challenges an erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, Rule 30 allows the issue to be raised in the motion for a new trial even if no objection was made contemporaneously. *State v. James*, 315 S.W.3d 440, 446 n.2 (Tenn. 2010).

Although "the Pattern Jury Instructions do not have the force of law, our trial courts 'frequently use them as a source for jury instructions.'" *State v. Davis*, 266 S.W.3d 896, 901 n.2 (quoting *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). Pattern jury instructions, which are not officially approved by the appellate courts or legislature, "should be used only after careful analysis." *State v. Hodges*, 944 S.W.2d 346, 354 (Tenn. 1997). Pattern jury instructions are only suggestions and "are not entitled to any particular deference on review." *State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008). Keeping these guidelines in mind, we compare the language of the instruction given by the trial court to the language in Tennessee Code Annotated section 39-16-503. The language of the pattern jury instruction is nearly identical to that of the statute. The trial court did not comment on the number of elements that the State was required to prove. Therefore, we determine that the instruction provided by the trial court herein fairly submitted the legal issue and contained a proper statement of the applicable law. Defendant is not entitled to relief.

*Juror Bias*

Defendant argues on appeal that Michael Robinson's presence on the jury violated her right to a fair trial and impartial jury because Juror Robinson revealed after trial that he was "friends on Facebook" with Mr. Christie and had heard people talk about Mr. Christie's case. The State counters that Defendant failed to show that Juror Robinson was biased on a material question in this case.

During voir dire, counsel asked prospective jurors if they knew Mr. Christie. Juror Robinson did not indicate that he knew Mr. Christie. Juror Robinson did inform counsel that he had previously served on a jury. About two weeks after trial, Juror Robinson signed an affidavit indicating that he "knew of" Mr. Christie through Pop's Music because they are "both musicians." Juror Robinson explained that he had no knowledge

- 10 -

of ever meeting Mr. Christie or Defendant in person but explained that he was "Facebook friends" with Mr. Christie because they had mutual friends in common.

Every criminal defendant has a constitutional right to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012). Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge. *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990). "A court may discharge from service a . . . petit juror . . . who is disqualified from such service, or for any other reasonable or proper cause, to be judged by the court," including "[t]hat a state of mind exists on the juror's part that will prevent the juror from acting impartially." T.C.A. § 22-1-105. Generally, juror disqualifications are based upon one of two theories: (1) *propter defectum*, meaning "[o]n account of or for some defect," Black's Law Dictionary 1385 (Rev. 4th ed. 1968), or (2) *propter affectum*, meaning "[f]or or on account of some affection or prejudice," *id. See also State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). Because Defendant complains of bias or partiality against her, the claim is one of *propter affectum. See State v. Furlough*, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990).

The Supreme Court has observed that "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved" in a trial. *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). Instead, "'[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Id.* at 800 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The defendant must "demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Id.* (quoting *Irvin*, 366 U.S. at 723). The defendant must establish a prima facie case of bias or partiality. *Akins*, 867 S.W.2d at 355 "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Id.* Silence by a juror when asked a question reasonably calculated to produce an answer is tantamount to a negative answer. *Id.* "Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality . . . ." *Id.* at 356 (footnotes omitted). "The test is whether a reasonable, impartial person would have believed the question, as asked, called for juror response under the circumstances." *Id.* at n.13. The juror's intent is not dispositive of the issue of bias. *Id.* at n.15.

Here, the record does not clearly establish that Juror Robinson actually knew and recognized Mr. Christie, let alone that he had any prejudice against Defendant. Defendant has failed to establish a prima facie case of bias. *Id.* at 355. Defendant also argues that Juror Robinson would have been challenged if he revealed this information.

- 11 -

However, none of the potential jurors was asked whether they had heard about the case against Mr. Christie. In consequence, Defendant is not entitled to relief on this issue.

*Judicial Diversion*

Lastly, Defendant challenges the trial court's denial of judicial diversion, arguing that there is no substantial evidence in the record to support the denial of diversion. In the event that this Court upholds the denial of diversion, Defendant asks this Court to reduce her sentence of "shock incarceration" to time served. The State contends that the trial court properly weighed the factors for judicial diversion and determined that the factors against the grant of diversion outweighed the factors in support of the grant of diversion.

When a defendant challenges the length, range, or manner of service of a sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. This same standard of review applies to the trial court's decision to grant or deny judicial diversion. *State v. King*, 432 S.W.3d 316, 325 (Tenn. 2014).

Judicial diversion is a form of probation that affords certain qualified defendants the opportunity to avoid a permanent criminal record. *See* T.C.A. § 40-35-313(a)(1)(A). If a defendant qualifies for judicial diversion, a trial court may defer proceedings without entering a judgment of guilty, placing the defendant on probation without categorizing the defendant as a convicted felon. *Id.* Upon successful completion of the probationary period, the trial court will dismiss the charges and the defendant may seek expungement of the record, which "restore[s] the person, in the contemplation of the law, to the status the person occupied before such arrest or indictment or information." *King*, 432 S.W.3d at 323 (quoting *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999)); *see* T.C.A. § 40-35-313(a)(2), (b). However, if the defendant violates the terms of his or her probation, "the court may enter an adjudication of guilt and proceed as otherwise provided." T.C.A. § 40-35-313(a)(2). "Judicial diversion is a form of 'legislative largess' available to qualified defendants who have entered a guilty or nolo contendere plea or have been found guilty of an offense without the entry of a judgment of guilt." *King*, 432 S.W.3d at 323.

A defendant is eligible for judicial diversion if he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony, has not been previously convicted of a felony or Class A misdemeanor, has not been previously granted judicial or pretrial diversion, and is not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-

313(a)(1)(B)(i). "Eligibility under the statute does not, however, constitute entitlement to judicial diversion; instead, the decision of whether to grant or deny judicial diversion is entrusted to the discretion of the trial court." *King*, 432 S.W.3d at 323. The trial court must consider several common law factors:

> "(a) The accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused."

*Id*. at 326 (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). "[T]he trial court must weigh the factors against each other and place an explanation of its ruling on the record." *Id*. (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)).

When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this Court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id*. at 327. Our supreme court has explained:

> Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*Id*. Failure to consider the common law factors results in a loss of the presumption of reasonableness, and this Court will either conduct a de novo review or remand the case to the trial court for reconsideration. *Id*.

A trial court can abuse its discretion not only by failing to consider all of the relevant factors, but also by giving undue consideration to an irrelevant factor. In the context of pretrial diversion,[3] the supreme court has held that the prosecutor's

---

[3] The difference between the two types of diversion is that judicial diversion follows a determination of guilt and the decision is made by the trial court, whereas pretrial diversion is a decision by the prosecutor to suspend prosecution for a certain period of time. *Compare* T.C.A. § 40-35-313 *with* T.C.A. § 40-15-105.

consideration of and undue reliance upon an irrelevant factor constitutes an abuse of discretion. *State v. McKim*, 215 S.W.3d 781, 788 (Tenn. 2007) (holding that "[t]he prosecutor's consideration of, and emphasis upon, an irrelevant factor so tainted his decision-making process as to constitute an abuse of discretion"); *see also Stanton v. State*, 395 S.W.3d 676, 687 n.2 (Tenn. 2013). "[J]udicial diversion 'is to be imposed within the discretion of the trial court subject only to the *same constraints* applicable to prosecutors in applying pretrial diversion.'" *King*, 432 S.W.3d at 327 (quoting *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992)) (emphasis added in *King*); *see State v. Cutshaw*, 967 S.W.2d 332, 343 (Tenn. Crim. App. 1997) ("Tennessee courts have recognized the similarities between judicial diversion and pretrial diversion and, thus, have drawn heavily from the case law governing pretrial diversion to analyze cases involving judicial diversion."). If a prosecutor can abuse his discretion by considering and placing undue weight upon an irrelevant factor in determining pretrial diversion, then it stands to reason that a trial court can likewise abuse its discretion in considering and placing undue weight upon an irrelevant factor in determining judicial diversion.

The following proof was presented at the sentencing hearing. Dr. James Roy Appleton, Jr., a retired urologist, testified that at the time of the hearing, he was "in charge" of Mid South Recovery and "ran the aftercare program at Cumberland Heights" with Defendant. It is an entirely voluntary program for people who have completed long-term treatment. Dr. Appleton had known Defendant since 2008 and considered her to be an "extremely honest" person who was "guilty of being a loving, caring mother." Ruth Meyer, a mental health counselor at Cumberland Heights, also knew Defendant through her volunteer work at Cumberland Heights. She described Defendant as a "recovering alcoholic" who had become a "model to others." Beth Cole, a recovering addict, described Defendant as a "very positive influence[]."

Lynn Caldwell met Defendant approximately thirty years prior to the sentencing hearing through work at the Department of Correction. She later became the case manager for Shiloh Group Home, a residential boy's facility at which Mr. Christie was placed. Ms. Caldwell explained that Mr. Christie had a "severe case[] of bipolar disorder" and was diagnosed at an early age with the disorder. She described Defendant as "extremely dedicated" to her son, "caring, compassionate" to others, and a genuinely honest person.

Tom Crider, District Public Defender for the 28th Judicial District, testified that he had worked with Defendant on several cases throughout the years. He described her as a "zealous, passionate advocate, particularly for children, for abused women."

The presentence report revealed that Defendant had three traffic offenses for speeding between the years of 1997 and 2013. The record also indicated a conviction for simple assault in Jackson City Court in 1992. However, at the sentencing hearing,

counsel for Defendant informed the court that Defendant paid a fine but was not convicted. Counsel for the State agreed that it was a "city ordinance violation" but commented that it would qualify as criminal behavior. There was other information about a charge for driving under the influence for which Defendant was found not guilty.

The trial court commented that Defendant was convicted of a "very, very serious matter." Defendant "directly involved herself" in an "ongoing investigation" into the victim's death and "admitted under oath that she deleted video that was very incriminating" because it placed Mr. Christie with the victim prior to her death. The trial court noted that she never accepted responsibility or admitted that she deleted evidence. In fact, the trial court noted that "she didn't think she did anything wrong by deleting pictures and videos."

In looking at enhancement factors, the trial court noted that Defendant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range, giving that "great weight." The trial court also found that Defendant was the leader in the commission of the offense which involved two or more criminal actors. In mitigation, the trial court considered that Defendant's conduct neither caused nor threatened serious bodily injury and that Defendant had a "good work history." The trial court noted that Defendant attended in-patient treatment for alcohol abuse in April of 2005 and that she remained sober. The trial court commended Defendant for that accomplishment and gave it "great weight."

The trial court noted that Defendant was a candidate for judicial diversion. The trial court considered Defendant's amenability to correction, noting there was "nothing in the history that indicates that she would not be amendable to some type of corrections program" weighing in favor of a grant of diversion. The circumstances of the offense, on the other hand, weighed against the grant of diversion. The trial court specifically noted the ongoing murder investigation at the time of the destruction of the evidence. Defendant's criminal record was "not too serious" except for the assault, and the trial court ruled that it "kind of weigh[ed] evenly as far as the criminal record is concerned." The social history was "balanced" with Defendant's alcohol addiction on one side and her treatment of the addiction on the other. Defendant's mental and physical health, according to the trial court, weighed in her favor. The deterrent effect of the sentencing decision to Defendant and others gave the trial court pause, eventually leading the court to conclude that the deterrent effect weighed "heavily against" the grant of diversion. Finally, the trial court determined that the grant of diversion would not serve the interest of the public or Defendant.

As a result, the trial court found diversion would not be appropriate and sentenced Defendant to a mid-range sentence of four years, six months as a Range I, standard offender with a fine of $1000. The trial court found that Defendant "knew" what she did

- 15 -

was wrong and "still made a deliberate intention to dispose and try to get rid of evidence" in order to "protect her son and be a good mother." The trial court found that Defendant had the potential for rehabilitation and would be able to comply with the terms of probation but that there was a need to "provide an effective deterrent." As a result, the trial court ordered 150 days of "shock incarceration" prior to release on probation supervised by Community Corrections Alternative Sentencing Program. The trial court also ordered her to complete 50 hours of community service and to testify "truthfully" if called at her son's trial.

Because the trial court made extensive findings during the sentencing hearing, we will view the trial court's decision with presumption of reasonableness and uphold the denial of diversion so long as there is any substantial evidence to support it. *See King*, 432 S.W.3d at 327. After our review, we determine that there was substantial evidence in the record to support the denial of diversion. While Defendant was certainly amenable to correction, as evidenced by her ability to remain sober for an extended period of time, her minimal criminal record, good physical and mental health, and her positive social history, it was within the trial court's discretion to conclude that the circumstances of the offense and the deterrent value to the accused, as well as others, outweighed the factors in favor of diversion. The trial court did not abuse its discretion. Defendant also asks this Court to reduce the period of "shock incarceration" to time served of 68 days. The trial court also did not abuse its discretion in ordering Defendant to serve a period of incarceration prior to release on probation. The trial court considered that a sentence of full probation would depreciate the seriousness of the offense. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE